Good morning, Your Honors. May it please the Court. There are a number of issues in this case, and this morning I'd like to focus on just a few in the time that we have. And the first is the Batson claim. Our claim here, as the Court knows, focuses on the prosecution's peremptory strikes against two Hispanic members of the veneer, Rolando Mondujano and Maria Cerda. As the Court also knows, the standard Batson analysis has three steps, but every Court to have looked at our claim so far has resolved it under the third step, and that's where we think it ought to be resolved. At that third step, the question is whether the particular race-neutral reasons offered by the prosecution for the peremptory strikes in question should be believed, or whether, considering the totality of the available evidence, those reasons are better viewed as pretext for purposeful race discrimination. I'd like to make three points first about the general shape of that analysis at the third step. The first is that although a State court's determination that certain strikes were not based on purposeful discrimination is ordinarily entitled to a presumption of correctness on Federal habeas review, that presumption is not warranted here, and the Court's review should be de novo. The reason, as we explain in our brief and as the district court noted below, is that both the State trial court and then the California Supreme Court simply applied the wrong legal standard in reviewing this claim. The California Supreme Court did not. It would inject the trial court's incorrect. That's right. But it did not manifest any indication that it was applying an incorrect standard. Well, what the California Supreme Court failed to do was to correct the error of the State trial court. We're not reviewing whether it was, you know, correctly reviewed the trial court. It made a finding which is not infected by the systematic language. What the California Supreme Court failed to do was to say that the law requires that each strike not be based on race. The California Supreme Court said it was preferable that a State court, a State trial court, when reviewing a challenge, make findings on each strike. It's not the point about whether its finding of fact is entitled to deference. Well, the fact. It would have done something goofy with that finding, but it made a finding. The only finding I think the California Supreme Court can be thought to have made, if we focus in particular on the strike of Juror Serda, which is one of the two, if we focus on that, the California Supreme Court seemed to rely heavily on its reading of the record to suggest that Serda was hesitant or ambivalent or equivocal in her views on the death penalty. The record to do with all respect is that it took the trial court's or, excuse me, the prosecution's claim that she was young and inexperienced and it found, as I think the California Supreme Court looked to the objective evidence of that and cited the record. I don't think it created some independent ground on its own. Well, I think that's different. I think it's fair to say the California Supreme Court did two things. I think one is that it said implicitly, though the state trial court never addressed directly the reasons offered by the prosecutor, that the general treatment of the entire Wheeler hearing is consistent with an inference that the state trial court must have believed those reasons offered by the prosecution. That was that Serda was young and the prosecutor said he believed single, though in fact she was married, and that she lacked the kind of life experiences or responsibility that he was looking for in a juror for a trial like this. Separate from that, I think. That's what she said in her voir dire. She said, I've never been in one of a death penalty. I can't tell you. I'm not sure what I would do. Her responses invoked her own lack of experience. So are you suggesting that the California Supreme Court invented post hoc a different rationale than was actually offered, or are you just saying, well, I'm not, what are you saying? I think if we're speaking about, I think two things. The California Supreme Court accepted or deduced that the trial court must have accepted the reasons offered by the prosecutor. And those specific reasons had nothing to do with Serda's views on the death penalty or the answers that she gave. Nor did the California Supreme Court use her statements for. The point was when you read her statements, she didn't know what she thought about much of anything or why she did or didn't think it. Which, to me, amply supports the determination that she lacked the kind of life experience and maturity to take on a case such as this. Well, what the California Supreme Court said as to her answers was that she expressed equivocation and ambivalence in her view on the death penalty. Her answers were equivocating and ambivalent. I think it's telling that the prosecutor, when he had a problem with a juror's answers to the death-qualifying questions, the prosecutor singled that out as a reason. The point, Mr. Morrison, I just would like, I repeat it to get your response to it, the point is not her views on the death penalty. That's beside the point. The point is that she couldn't articulate views one way or the other, and that is what manifested a lack of maturity and ability to deal with a serious case. So I understand the question. And I think my answer is that if the prosecutor had thought that that was the source of his concern, if that had been the source of his concern, his treatment of other jurors' answers to death-qualifying questions suggests that he would have raised it as a source of his concern. The other part, which is the death thing, has nothing whatsoever to do with a manifestation of lack of judgment and seasoned ability to deal with difficult issues. Well, for example, maybe I can point to one other. When the prosecutor justified his strike of Juror Chambers, he didn't say, look, he expressed a hostility to the death penalty. He expressed a concern about ambivalence, which I think would suggest that if ambivalence translated for the prosecutor ambivalence about the death penalty into a lack of judgment or responsibility generally. I don't know whether it's foggy or hot outside. My point is the death penalty aspect isn't what mattered. What mattered was that she did not manifest the ability to think clearly about anything. Well, I think even assuming that one ought to read the answers that she gave to the death qualifying questions as manifesting this sort of general lack of certainty that then produced a kind of concern about lack of experience and responsibility, I think the point at the third step of the Batson analysis is to consider the totality of the evidence. And so the totality consideration would include more than just that. It would include a number of things. So especially if we focus on the precise words used by the prosecutor, even assuming, again, that the answer can be to the death qualifying question can be taken as evidence towards the reasons given by the prosecutor. He said that Sarita was very young and he thought single, and that she didn't have the type of life experiences or responsibility to take on a case like this. And so we have to evaluate those precise reasons, not any other reasons, against the totality of the record. And I think the totality of the record includes a number of things. First, the court should take note of the general numbers, that is the numerical pattern in the strikes that the prosecutor engaged in here. In this case, eight out of the prosecutor's first 12 strikes were exercised against racial minorities, four against blacks, four against Hispanics, leaving only one Hispanic surnamed person on the jury at that point. That kind of pattern, far less than that kind of pattern, has been recognized in earlier cases of this court to at least generate an inference of impermissible discrimination. And though that's typically the first step, it can be considered again at the last. In addition to that, the prosecutor himself spoke in terms of race when describing his approach to jury selection. He coupled that with an explanation that when challenged that he was being biased. He says, why should I be biased? I've got a Hispanic witness and a black witness. I'd be delighted to have an Hispanic or black on the jury. Hernandez indicates that's a perfectly acceptable explanation in support of opposing a challenge. Well, if it – if what the prosecutor was suggesting, that he was thinking in terms of racial balancing or targeting a certain number of racial minorities on the jury. That's not what he said. He just said, look, why should I – why should I want to get rid of a black or Hispanic perspective juror when I've got a black and Hispanic witness? He went beyond that, Your Honor. He said, actually, that he prefers on a case like this to have minority jurors. And I think the legal question is, if the prosecutor acted on that preference and if his peremptory strikes reflected that preference, there would be constitutional infirmity in one or more of the strikes. I think it's particularly telling here to put that statement together with what the trial court and the prosecutor here described as the governing legal standard. Neither the trial court nor the prosecutor said that the governing legal standard was whether any one of the peremptory strikes had been exercised on the basis of race. Instead, the trial court here said that the question is whether the prosecutor had engaged in the systematic exclusion of blacks or Hispanics from the jury. That's what the trial court said. And then the prosecutor himself said, the question is whether I go systematically when I exclude blacks. In that matter, did the defense counsel use the same phrase? Yes. That's correct, Your Honor. I think this is a question of law. The court – this was a Wheeler hearing, but this court has held that raising a Wheeler objection effectively raises a Batson objection. The governing legal standard is one where even a single juror being excused violates the Constitution. So if we put together the description of the standard agreed upon by both the court and the prosecutor, that is, the Constitution is not violated if one or even some minority jurors are excluded on account of their race, as long as the prosecutor does not systematically exclude those minorities. If we put that together with the prosecutor's statement that he prefers, in a case like that, to have minorities on the jury, I think we get a picture of the prosecutor as thinking in terms of race, as he assembles his jury, as thinking, I would like some minorities. I'm going to think in terms of race when I decide whether to strike particular jurors or to seat them. If that's what the prosecutor was doing, he violated the Constitution. That, I think, is the background against which we evaluate the particular strikes against Mondahano and Cerda. As to those, I think also useful is to do what the court has described as a comparative analysis, that is, to look at similarly situated white jurors not struck by the prosecution. And in this case, I think the comparison between Cerda and white juror Carlberg, who ended up serving on the jury, is particularly telling. I recall, again, the prosecutor said that he thought that Cerda was too young and he thought single and lacking in the kind of life experience and responsibility necessary to serve on a jury of this kind. And so thinking about those criteria, let's compare Cerda and Carlberg. Cerda was 27 years old. Carlberg, three years younger than her, 24. Both were married and both were employed by the telephone company, one as a so-called customer representative. That's how Cerda described her job. And one as a service clerk. That's how Carlberg described her job. So I think if being... Service clerk is, I believe, what Carlberg said. And customer representative, which I assume must mean customer service representative, is how Cerda described her job. If being in one's mid-20s, married and employed by the telephone company, were really manifestation of a lack of experience or responsibility, then presumably the prosecutor would have struck Carlberg in addition to Cerda. Yet he ceded her. And this court and the Supreme Court have made clear that the failure to strike even a single juror, who is similarly situated to a juror struck in the subject of a Batson challenge, can produce evidence that the strike was, in fact, exercised on the basis of race. So I think if you put together the pattern of the strikes, the prosecutor's own statement that he understands he's only being held to a standard of systematic exclusion of minorities, and then his own admission that he thinks in terms of race when he approaches the jury selection process, and then the comparative analysis that shows that at least one similarly situated juror was ceded by the prosecution rather than being struck, that I think is an overwhelming case that in fact what the prosecutor did when striking Cerda, and for that matter Mondehano, was to act on the basis of purposeful race discrimination into a violated Batson. If I could move then briefly to our juror misconduct claim. In this claim, unrebutted record evidence in the form of a declaration by juror Sarah Nordell indicates that during Mr. Sims' trial, the juror served on the jury of Mr. Sims' co-end ID, Ruby Padgett. The same unrebutted evidence indicates that juror Morrow and the Padgett juror developed a plan to write a book together. The book would be called Seat Number Three, reflecting the fact that both sat in Seat Number Three on their respective juries. In addition, the unrebutted evidence establishes that juror Morrow told other members of Mr. Sims' jury about the Padgett juror and their plan to write a book. We're alleging three separate constitutional harms here arising out of this evidence. First, it appears that Morrow learned specific facts regarding the Padgett trial from the Padgett juror, and she may have shared that extraneous evidence with other members of Mr. Sims' jury. Well, if she did, Ms. Nordell didn't say so. Well, we think that we can draw the inference from the Nordell declaration. Well, the opposite inference. I think the question is precisely as to the line in the declaration that you've identified, Your Honor. That is, what to make of the statement in the declaration that Morrow and the Padgett juror were looking forward to talking in greater detail about the two cases once they were over. I have absolutely no doubt that if Ms. Nordell could have said that Ms. Morrow had related to the Padgett trial, she would have said the same thing. Well, we think that the declaration can be read consistent with that, but really at this point, this claim has not even been given an evidentiary hearing. And so the question there. It was there to hear. I mean, the best you could come up with is a declaration which says they talked about doing a book maybe. It wasn't a book deal. And there's nothing to suggest they had any substantive conversation about this trial. Well, Your Honor, the question for purposes of an evidentiary hearing is not the contents of a declaration that we've submitted. Well, it's whether the allegations made here in the habeas petition would have proved entitle us to relief. That's the whole point I'm saying. There's no evidence that exists that I could find that there's anything to try. Well, even assuming that the Nordell declaration can't be read as we would like it to be read, I think the point here is the declaration was entirely unnecessary to get an evidentiary hearing. All we needed to make were good faith allegations that, if true, would entitle us to relief. And that we did in the habeas petition itself. On pages 18 and 19 of the habeas petition, we alleged that the Padgett juror told Juror Morrow information from Padgett's testimony at her trial, that that testimony shifted the blame from Padgett to Mr. Sims. Yeah. I guess the point is, if he had a good faith basis for doing that, there would have been a declaration from one or the other of them to that effect. Well, if by one or the other you're referring to Juror Morrow as one of the two, this is not in the record, but I can tell the Court that the reason there isn't a declaration from Juror Morrow is she has repeatedly refused to talk. Well, no kidding. Well, it seems to me that precisely the point of an evidentiary – You know, there you are. Well, I actually think that that's powerful evidence for us to the extent it's cognizable. Respectfully, Your Honor, the reason I think it cuts in our favor is that it would be precisely the point of an evidentiary hearing to use the subpoena power of the Court to compel Juror Morrow's testimony and to find out whether the allegations we're making in good faith here, which we think are at least supported to some degree by the Nordell Declaration, are true or not. If the standard, again, is allegations, not evidence, but allegations that if true would entitle us to relief, it seems to us that we've gone far beyond that standard. We have alleged things that if true would entitle us to relief, and we have, to the extent we're able so far without the benefit of the Court's subpoena power, presented some evidence in support of those allegations. So we think on the basis of that, at the very least, an evidentiary hearing would be warranted here. Of course, we're not just talking about the possibility of extraneous evidence. We're talking about also the potentially biasing influence of this book plan itself, not only on Juror Morrow, but on other jurors who might have shaded the way that they participated in deliberations, fearing then that their deliberations would be exposed to public scrutiny if the book ended up being written. So extraneous evidence and the biasing influence of the book plan on both Morrow and the other jurors, it seems to us, on the basis of the Nordell Declaration, as we've argued in our brief, we think we're entitled to relief now. But if we aren't, we've certainly gone far beyond the standard we need to meet in order to get an evidentiary hearing below. I think that's fair. Can I understand on your Nordell Declaration, is your proffer that paragraph 5 where she goes on to talk about learning the pageant had been convicted, are you suggesting that that's part of your proffer with regard to Marlene as opposed to... Is that a different source? In other words, when you said she learned something, you're relying on paragraph 3 essentially of the declaration. That's right. To the extent we're relying on evidence in the declaration, it's paragraphs 2 and 3 of the declaration. We cited that for the court at pages 47 and 48 of our opening brief. Again, though, I guess I want to stress this one more time, that even if we hadn't presented a declaration at all, the legal standard is whether the allegations contained in our habeas petition would, if proved to be true, entitle us to relief. It seems to us, again, that we've more than done that in this case. If I could then move to our Miranda claim. As the court knows, there were many statements taken from Mr. Sims across two days of interrogation on December 25th and 26th. I'd like to focus on just a few points, first by looking at the very first statement. That is the statement, I had to kill that boy, made on December the 25th. This statement came in response to Officer Perkins' long soliloquy about the crime scene in Glendale. That soliloquy was in turn. The California Supreme Court assumed that all of the statements were improperly obtained. No, the California Supreme Court assumed that the statements. On the 25th. On the 25th, the California Supreme Court did not assume it found. It assumed as to the 26th. Statement on the 26th. That's right. It drew the line as soon as the subject changed from what's going to happen on extradition. As soon as the Glendale officer started introducing the subject of his own activities. At that point, the California Supreme Court said that impermissibly initiated on the part of the police an interrogation. That's precisely right. To what deference or how bound are we by that determination? Well, I think the factual findings implicit in the California Supreme Court's conclusion are findings entitled to a presumption of correctness. So some of the key language I think found on page 419 of the excerpts of record. That's that's where the California Supreme Court's opinion and relevant part is. The findings include a finding that Officer Perkins' long soliloquy was non responsive to Mr. Sims inquiry and served no legitimate purpose incident to Mr. Sims arrest or custody. Indeed, I read the prosecutor as having characterized the volunteered statement about I didn't have to kill him as a non sequitur. Because it came in response, a volunteered response after the subject was about extradition. And yet, as I understand from the California Supreme Court, it was not Sims who shifted the subject. He wasn't responding to questioning about extradition or discussion of extradition. In fact, it was after the officer shifted to his own investigation. I think that's precisely right, Your Honor. That is another way of putting that is that it should have been no surprise to the to the officer that Mr. Sims responded with something like I had to kill that boy, because as the California Supreme Court found, the officer's entire line of conversation was a technique of persuasion. Another factual finding that I think is a deference, a technique of persuasion designed to produce the precise kind of response that it did produce. So, again, I think you're right, Your Honor. The subject was changed when, as even the officer, Officer Perkins, and the prosecutor during the trial conceded, Mr. Sims' question, what's going to happen next, was purely, that word purely is Officer Perkins, is purely about extradition. The subject was changed when we went from that discussion about a routine incident of the custodial relationship. I'm mindful of the time, so I can guarantee all three of us are exquisitely familiar with the record in this case. Can I direct you then to the issue of harmless error? Yes. Assuming then the California Supreme Court was correct in its conclusion that that statement was introduced in violation of Miranda, the question then is harmlessness. I mean, the standard under Brecht is whether the evidence had a substantial and injurious effect or influence in determining the jury's verdict. As we've argued in our brief, and I need not go into it here if the Court's familiar, we think that both the California Supreme Court and the district court really did the wrong kind of analysis as a legal matter, that it seemed to approach this question by asking how weighty was the other evidence in the case, rather than asking how significant and what kind of role did the impermissibly introduced evidence likely play. As the Supreme Court has said in Sullivan v. Louisiana, the question is not whether in a trial that occurred without the error a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered during the trial was surely unattributable to the error. We think both the California Supreme Court, when it said, well, the other evidence in the case was overwhelming as to the operative question of intent to kill, that it really did the thing that the United States Supreme Court said a court should not do at the harmlessness stage, and all the district court did was quote the California Supreme Court's finding on that point. So under the correct standard, the statements in question here, I think, can't be deemed harmless. Again, the statements in question are inculpatory statements by the defendant himself, and they were used by the prosecutor at the guilt stage to prove intent to kill. The statement, I had to kill that boy, is the first, and there were others. Intent to kill was significant, obviously, because both of the special circumstances, lying in wait and felony murder, required at that time under California law a finding of intent to kill. So without that finding, this wasn't a capital eligible conviction. He also used other evidence, though. So, I mean, by definition, a confession, we wouldn't be in these boats if a confession hadn't been used. So adopting your standard, trying to apply your standard, which gets a little metaphysical, I think, at least for this judge, trying to figure out, well, what do you mean you don't weigh the evidence, taking out the impermissible evidence. But in any event, the prosecutor obviously introduced the confession at various stages throughout his summation, both in guilt and both at penalty. But he also, as the California Supreme Court summarized in its finding, talked extensively about all the other conduct that Sims engaged in, both with regard to the victim in the motel room as well as the incidents at the Domino's Pizza. Yes. So, again, I think. Weigh that and decide that there isn't, in fact, that the confession, in or out. Right. The jury was clearly going to find that this was premeditated. I think, Your Honor, I want to make three points about that. I think the question, again, it's not that one tries to ignore all of the other evidence, but the focus of the analysis at least should be what likely role did the impermissibly introduced evidence play. And I think I want to make three points there. The first is both the Supreme Court and this Court have repeatedly stressed the special power of inculpatory statements by defendants. The Supreme Court has gone so far to say that it might be the most damaging evidence that could be admitted against a defendant. This was a tad different from an ordinary confession because there's really no issue. He did it. Yeah, I think it's. You're arguing that its value had to do with showing intent to kill. That's right. And that's what the. Quite like saying, I did it. Well, I would regard it as. There's no other evidence of who did it. I would regard. I see, Your Honor. I think it would. I still want to make the point that using it, it amounts to a confession on the operative legal question of intent to kill. And that's precisely what the prosecutor here said it meant. And so it's critical, I think, as Judge Fischer has suggested, to look at what the prosecutor said during closing argument. He said that these statements are very important because a statement from the defendant is a window into that defendant's mind. And as to the particular statement, I had to kill that boy, the prosecutor said that statement is really important because it shows the specific intent to kill. Well, if that statement is a window into the defendant's mind, then something else important during the jury's deliberations, I think, is a window into the jury's mind that it thought these statements were critical. This is not in our brief, but it's at page 59, 57 of the trial transcript, shows that the jury requested a readback during its deliberations of Officer Perkins's testimony regarding the Las Vegas interviews. And it was that testimony that introduced the inculpatory statements by Mr. Sims. The jury also asked for a readback of defense counsel's closing argument on the issue of intent. The Court refused properly to read back that because that's just argument and not evidence. Well, that's all just speculative. And I don't see that that's very compelling. Why isn't the – and you haven't yet mentioned the evidence, which to me is what the focus has got to be on. And can you tell me why you don't think the evidence with respect to how he treated Harrigan, how he responded after the incident at the hotel room and the preplanning of it, don't just make a slam-dunk case of intent to kill him? What I'd like to say there, Your Honor, is the point I've been trying to make is these statements, I think, are direct evidence of intent to kill. I hear you. One could draw the inference from the other evidence that there was an intent to kill, but I think it's circumstantial evidence. And it could admit of multiple inferences. But it's awfully powerful circumstantial evidence. Well, one of the things that the prosecutor pointed to was the manner in which Mr. Harrigan's body was found, bound and gagged in the bathtub with the water running. Yes, it does suggest intent to kill. Well, there was a battle of experts during the trial. And the defense theory depended upon an expert saying that he died from drowning, which nobody really said. They said, well, he could have died from drowning, but he would have died from strangulation anyway. And there's no possible way that when you hogtie somebody and put them, I don't see how you can even put them on their knees, but anyway, put them effectively on their knees in a bathtub, strangle. So if you move, you're going to strangle yourself to death and turn the water on. So if you are able to move at all, you're going to die by drowning. That doesn't show an intent to get rid of him, wiping all the fingerprints out, which would have been totally unnecessary if he hadn't intended to kill him. I don't think so, Your Honor. I think he was trying to remove evidence of his presence there at the crime scene. Putting the water on could be consistent with simply trying to muffle his cries for help or his attempts to escape. Was the drain plugged? No, it was not. The drain was only plugged because the victim's head effectively plugged it. That is, I think it's significant that Mr. Sims did not plug the drain. In fact, the drain plug did not work.  Again here, I'm not trying to argue that it's impossible to draw the inference of intent to kill, but the difference between the impermissibly introduced evidence and this other evidence is the other evidence is circumstantial evidence requiring an inference. The statement is direct evidence of the categorical kind that this Court and the Supreme Court have found particularly damaging. It's the evidence the prosecutor himself stressed as very important and really important to showing the specific intent to kill. And so far as we can surmise from the jury's deliberations, it was evidence that the jury itself, which stayed out over the course of two days for between nine and ten hours, I believe, in deliberations at the guilt phase, the jury itself thought was central to the question of intent to kill. So, yes, this other evidence could support an inference, but that's not the question. The question is what likely role did this evidence play? If the Court has no further questions, I'll reserve what few seconds I have for rebuttal. Thank you. Thank you, Your Honor. And may it please the Court, David Glassman, Deputy Attorney General, on behalf of the Warden. I will attempt to follow the order of issues as outlined by Petitioner's Counsel, and therefore I will begin with the Batson claim. I think it's important to stress in reviewing this claim that the way in which the claim has been portrayed to this Court, which involves a rather intricate examination of various jurors and the potential motives that may have, that one might attempt to apply as to the excusal of those jurors, bears no relationship to the way in which the motion was litigated in the trial court. We are, after all, reviewing a decision made by a trial judge with respect to whether or not the exercise of peremptory challenges was made in good faith and was made without a discriminatory motive. And I would point out, before I address the incidents or issues more specifically, that none of these comparisons were made in that approximately 17-page hearing, at which most of the work, frankly, was done by the trial court on a claim that, at that time, focused not on Hispanic jurors at all, but on the removal of black jurors. As this Court has indicated, the trial judge ultimately expressed for the record his view that the challenges were made for proper purposes. There is really no dispute as to his finding in that regard, realistically, and we know that in making that finding, the trial judge volunteered to review the case, and to review the questionnaire submitted by each juror. So the idea that has been pushed, at least in the federal court, that somehow everyone misapprehended whether or not this was an inquiry into the dismissal of each juror, as opposed to simply a misunderstanding that all of the jurors can't be properly excused, is belied by the fact that the judge reviews each questionnaire, and in fact each juror is discussed, including the two jurors who are alleged today to have been the source of, or rather the exercise of this improper motive. Counsel, is the judge not charged with reviewing the prosecutor's reasons to see whether they're pretextual? Yes, Your Honor. That's the standard that we look at. And in making that determination, the Supreme Court specifically said in the Batson decision when it announced this rule that a finding of discriminatory intent turns largely on the trial court's evaluation of the prosecutor's credibility, and that is what is missing from this petitioner's analysis, the fact that, as this Court has elaborated, even if attempts are, or rather the ruling is ambiguous, and I submit this one was not, the fact is that deference is owed to the judge that evaluated these jurors and this prosecutor that ostensibly had prior dealings with the lawyers involved and made the determination that the challenges, each of them was made in good faith. Did the Court not advance his own reasons rather than the prosecutor's reasons? Your Honor, as I recall, the Court specifically indicates that it is the trial judge that the Court was satisfied with the prosecutor's exercise of peremptory challenges and finds, as I recall, the specific language is no basis, and that is after hearing from the prosecutor. I think the only reasonable inference to draw is that the Court is listening to the prosecutor. It is the Court that points out, when the motion is first made, that the Court has been monitoring the peremptory challenges as against both African-American jurors and Hispanic jurors before anyone has asked the judge to take note of this. So this trial judge is mindful of this, and as Judge Reimer has pointed out, the prosecutor explains that he has no rational reason to challenge people in a discriminatory and irrational way in light of the facts of this case, that he has a Caucasian defendant, that he has an African-American and a Hispanic witness, and that it is nonsensical, and he adds, for the record, that such a motion has never been filed against him in the past. So there are ample statements by the prosecutor as to why he is excusing the jurors in question. The State Supreme Court, reviewing the case both under Batson and under the state law on the subject, Wheeler, is entirely satisfied, as is the district court, who goes the additional step of conducting a de novo review of the challenges of the jurors and finding that the jurors in question, and I would reiterate, we are now restricting ourselves in light of the Certificate of Appealability to only the Hispanic jurors, that those jurors were properly excused by the prosecutor for the reasons stated. In the briefs, I point out that the petitioner does not invoke the standard of review that applies when a state trial court and a state appellate court have made factual findings with respect to the lack of discriminatory purpose, but that standard of review applies here. I would like to turn now to the second claim raised by the petitioner. Before you move to that, counsel, there's a Johnson case up at the Supreme Court. Are any of those issues going to be relevant to what we're thinking about here? Judge Fletcher, my recollection is that Johnson has to do with the initial prongs of the Batson challenge, and that is moot in this case under Hernandez v. New York because as soon as the motion was made, the judge very politely asked the prosecutor, why don't you share your reasons with us? Do you think it's not going to go beyond an analysis of Phase 1? That was my recollection when I read it, so hopefully I'm right. If not, I imagine you'll get a brief from me at some point. I'd like to turn to the juror misconduct claim. And I would like to point out that I think the major deficiency is, you know, much was made in the petitioner's argument of the claim that all we need do is state a claim which, if true, entitles us to relief. If the standard were that negligible, there would be evidentiary hearings in every claim in every habeas corpus petition filed in this court. Because, it seems to me at least, nobody in their right mind files a claim, files a habeas petition that does not state a claim which, if true, would entitle one to relief. That's the point of filing the petition. More than that is required and must be required for there to be any kind of rational exercise of the right to an evidentiary hearing. In this case, with the benefit of many, many years of litigation, many lawyers, and I would imagine enough money, the only thing that was submitted with respect to this claim of misconduct vis-a-vis these jurors was the hearsay declaration of a juror from the Sims trial to the effect that another juror allegedly stated that the other juror, ostensibly Ms. Morrow, had had a conversation with a friend, as I recall, in the beauty parlor. Now. Well, I'm not sure, I mean, you're demeaning it because it's hearsay declaration. What else are they supposed to do? They're supposed to do, they should do, Your Honor, a number of additional things. They should either obtain the declaration from this witness or make clear why it could not be obtained. There is no declaration from Morrow. Maybe, but that doesn't, I mean, that doesn't address whether or not the one they got from someone who has served up the issue. I mean, I'm not sure what, I take your point about there has to be maybe something more, but when you then shift over and sort of sweep aside or discredit a declaration because it's hearsay, by definition it's hearsay. Well, Your Honor, my point is, I'm not slicing it that fine. My point is that they have not obtained statements from the jurors allegedly involved at all, and they have not demonstrated why that could not be done. But I'm moving beyond the threshold procedural issue to the substance of what is alleged because, and this was discussed, I think, by the Court already, but I want to reaffirm it. And I'll indicate at the outset, I'm not defending any discussion that should not have taken place between a trial juror and anyone else, but we do need to look at what was allegedly said in this declaration. And despite the very colorful language in the brief, the petitioner's brief, about a plan being hatched and a financial interest in selling a book, I submit that when one reads the actual statement, ill-advised though it may have been, there is no indication of any of that taking place. Marlene, I'm quoting now from this, I'll stop calling it a hearsay declaration, Judge Fischer, and I'll just call it the declaration. Marlene told us that she first learned about her, let me read it earlier. One of the jurors, Marlene Morrow, told me and several of the other jurors that a friend of hers had served as one of the jurors in the trial of Mr. Sims' co-defendant, Ruby Padgett. I'll interrupt to point out that these jurors were well aware of Padgett's role in this case by virtue of the evidence that they heard. Let me continue. Marlene told us that she had first learned about her friend's service on the Padgett jury when she and her friend had met in a beauty shop that they both frequented. She told us that as they talked, she and her friend discovered that her friend had occupied the same seat in the jury box during the Padgett trial, seat number three, that Marlene was occupying during the Sims trial. Marlene also told us that she and her friend were thinking of writing a book together about the two trials. She said that they were going to title the book something like Seat Number Three. She said they were both eagerly looking forward to getting together once the Sims trial was over to compare their experiences as jurors in the two cases and to work on their book. I do not exactly remember when during the trial Marlene told us about her friend, but I do remember it was before we began our guilt-faced deliberations. Now, I'm not praising this. I'm not defending it. But the point is, this conveys nothing that could be construed as actionable misconduct, which is why when the petitioner cites cases on the subject of jury misconduct, they invariably involve a juror transmitting to fellow members of the jury inadmissible and inflammatory information typically about the defendant's criminal past. Let me ask this. Was it apparently, was it generally known to the jury that the other party had been convicted? My recollection, Judge Fletcher, is that several jurors were aware that she had in fact been convicted. And there was a claim that did not proceed to this court and was not involved at the evidence you're hearing either that involved jurors' knowledge of her case. But regardless, and I cannot, given the size of the record and all that, I cannot more specifically advise you as to exactly what that information was. But it is true, two things. One, of course, Padgett's role was, her involvement rather, in the robberies and the murders was part of this case. And second, the, and I don't want to go too far down the road of speculation here, but the fact that Padgett was convicted arguably is at least as helpful to Petitioner as it is damaging. In other words, it reinforces her culpability in the case. And so it's difficult for me to fathom offhand why it is that the fact of her conviction necessarily prejudices him. I'll turn then, if I could, to the Miranda claim. The Petitioner began his discussion of the claim by describing what occurred between the Petitioner and the police on Christmas Day and the day after that of 1985 as two days of interrogation. This was not two days of interrogation. There was a brief meeting on the 25th of December in which the Petitioner invoked, and as the police prepared to leave, there was the colloquy that has created this debate for many years. And that brief conversation ended shortly thereafter. And later, it was the Petitioner, not the police, who called and informed the police he wanted to talk to them, and they returned on the 26th. So to paint the portrait of there being two days of police-dominated interrogation in this case, I think, misstates the record. As does, well, so having said that, as the court... for the defendant, what do we do, given the fact that the California Supreme Court has looked at this very issue and all have agreed that there was improper interrogation, whether it was two days or whatever? We understand the circumstances. Those are clear. But the California Supreme Court had no problem clearly finding the critical day, which is the December 25th conversation, because that's when he makes the most direct admission of, I had to kill the boy. Why shouldn't we just accept that and proceed to harmless error? Well, we, certainly for purposes of my argument, I will proceed to harmless error, but the reason that we need not, and the reason that the district court did not, and the district court, in fact, this case has led to multiple interpretations, although all courts have agreed as to harmless error, the district court, in fact, found that the statements on the December 25th were properly admitted, and that is that no Miranda violation occurred, because on the question of interrogation on the mixed law and fact issue that the California Supreme Court resolved, that is not, I submit, a factual, a purely factual determination, which I am bound by and have stopped from disputing. I think that's right, but the problem is that the California Supreme Court, in talking about the technique of interrogation, seems to be making a fact finding that would be entitled to deference. Except, Your Honor, for example, the state trial judge, the judge that listened to Detective Perkins testify, made the factual findings in the first instance, and there are as well those factual findings in this case. As to the, and I would, again, submit that with respect to the Supreme Court's characterization, I think it is inherently a mixed question, because the court is applying case law to that determination in terms of deciding the impact of Perkins' conduct. And in doing so, the, what I submit is given short shrift in that analysis, is the Oregon versus Bradshaw case from the Supreme Court, in which, and that case is also not addressed at great length by the district court, although the district court finds that no interrogation occurred. I submit that there is no daylight between the facts of Oregon versus Bradshaw and this case with respect to what it means when, after police have terminated an interview, a defendant says, what happens to me now? Well, yeah, but that was, that's true, and Paget, I think his name is, told him, what happens to him now is there'll be this debate between South Carolina and California, and oh, by the way, what I'm doing is, and then gets into his discussion, and I was struck by two things. One, that the California Supreme Court looked at that scenario and found what it did, and that the prosecutor, in closing argument, used the supposed non-sequitur of Sims blurting out in response, you know, this statement, I killed the boy. Well, at least the non-sequitur is true if he were doing it in relationship to a discussion of extradition, but it wasn't. He was blurting it out after, as I understand the facts, that Paget got into his investigation and put on the table what had gone in the hotel room. So even the prosecutor in this case seemed to think that it was unrelated to the extradition, which indeed was the question that Sims asked. My interpretation is different, Judge Fischer, and that is that the volunteered statement is not a statement that one would expect in response to the explanation that Detective Perkins has given Sims. But as to the point that you're raising, first of all, and now I'm returning to the district court's analysis, in which the district court, and we for that matter, citing cases like this court's decision in Shuttlebauer, in which officers are deceiving the defendant about the facts of the case, or Marino Flores, I think I could be mistaken as the other case. And the court indicates in both of those cases that an explanation about the facts and circumstances of the case is not interrogation. If I can return just for one minute, because I'm about to contradict a lot of this potentially with a point that I'm going to make, and that is that the Bradshaw case, which I would again ask the court to look at, it's true. It has what this case does not have, which is the officers, after the defendant's statement, reiterating the Miranda advice. But that can't be a requirement, and it is not a requirement. There, the officers, ironically, do in this case what the detective does just after the statement. In other words, they explain the facts of the case to the defendant. And notwithstanding all of that, the United States Supreme Court says that when the defendant says, what is going to happen to me now, he is initiating a general conversation about the crime. But the reason that I don't want to dwell inordinately on the Miranda claim, and in particular the disagreement that I have with respect to the petitioner about a methodology, if you will, with respect to how the State Supreme Court resolved the Miranda claim. The criticism that they make of the State Supreme Court and of the district court, as I understand it, is that they have essentially botched the Brecht analysis, or the harmless error analysis, by focusing too much on the weight of evidence, irrespective of the statement, rather than focusing on the intrinsic prejudicial impact of the statement, if I understand them correctly. There are two responses to that. The first is, the point is irrelevant in light of this court's decision cited in my brief in Medina v. Horning, in which the court says it doesn't matter how the state court goes about its harmless error analysis in terms of whether or not the state supreme court decides that the statement is improperly admitted. Nevertheless, found it harmless, not under the Brecht standard, the fairly lenient standard that applies in this court, but under the Chapman v. California standard.  decided that the statement was improperly admitted. And the reason that all of this discussion about the statements of this petitioner on the 25th, on the 26th, some of them were admitted, some of them were not, all of that is completely belied by the physical circumstances of this case, in which a 21-year-old young man is lured into a motel room where the petitioner foists a gun on him, orders him ostensibly to take off his uniform shirt. He doesn't merely bind him and gag him. Rather, he doesn't merely hogtie him, which is the description I think I heard before, which is in and of itself, of course, a brutally sadistic act. He takes a sock and he places it in the boy's mouth. He places a pillowcase. Correct, I'm sorry. He takes a washcloth bound by a sock, puts it in his mouth, puts the pillowcase over the boy's head, and applies a ligature, a rope to the pillowcase that the coroner testified in and of itself will kill the boy in 10 minutes. And he then submerges the boy in the tub full of water. Is that what the record shows? It says he was found with the water running, but the drain was pulled. And my impression is, as I think counsel for the defendant said, it was plugged by the body of Harrigan. So putting somebody into a tub with the water running but the drain open raises the question of what's the purpose of having the water on? I understand that the body was found head under the faucet with the water running on it, but the reason I ask that is if the whole idea, well, one of the things that comes to mind is if he put him in the tub and left the water running, that water's going to spill over the tub pretty soon. It's going to drain out and it's going to alert people to the fact that somebody's there, if that's what it is. Respectfully, Judge Fischer, and I think Petitioner's counsel indicated this, I believe the testimony was that the drain was broken. So that's not exactly a point of leniency. But he wasn't putting him into a full tub of water. You said he was put into a tub of water. There is water in the tub, since he's discovered later with water in the tub. At the moment that he put him in, I don't recall whether there was an attempt to establish exactly how much water was in there. My point is, and this was a point found beyond a reasonable doubt by a state Supreme Court, that no rational person, I submit, can deny the obvious intent inherent in that conduct. And yes, was it disputed? Was there some attempt, some far-fetched claim in the guilt phase to do something? I mean, what else could he do? He had to produce some effort to establish that this was other than an intentional murder, otherwise we're halfway to the death penalty phase being concluded. Well, I take your point, and I understand what the Court found. And there is this overwhelming evidence of brutality. But in none of the cases is the person killed outright. His argument is that if there's no confession here, the jury's left to ponder exactly what you're arguing, which is, are these things he's doing exceptionally cruel and whatever, with a high risk, a high probability of killing them, but is the primary intent, the real intent, simply to prevent them from escaping? We can go over to, I'm aware of the facts in the cooler. I mean, it's 32 degrees. He knows the thing isn't going to be open for 10 hours and whatever. But actually, Judge Fischer, the facts in the cooler are important in two other respects, because when he leaves the boy or the boy's body and he goes to the pizza store, he's wearing a sweater to conceal the boy's uniform. And when the manager, who has the presence of mind to try to be very orderly with Sims upon realizing that this is a robbery, when the manager advises him that they expect a delivery boy back because he's unaware of what happened to the boy, Sims unveils the boy's uniform and says with a laugh, I don't think so. I think that's an indication of his intent. But furthermore, because he had him bound up, I assume he wouldn't be back shortly. That would be true whether he was dead or alive. And it would also be true that if he were merely incapacitating him in a grotesque scenario that Harry Houdini could not liberate himself from, that Mitchell Sims would not have wiped down the room as meticulously as he did for fingerprints. My point I was about to make with respect to the cooler is that when the remaining employees are hanged by the petitioner, notwithstanding again the theoretical possibility that this might be just simply the most painful form of incapacitation one could imagine, the jury ultimately convicts the petitioner of attempted murder as to each of those. There are no statements. That's true. But again, one is trying to, that's why I say it gets a little metaphysical trying to go back and speculate what the jury would or wouldn't have done had there not been this confession out there, which really erases the need for a lot of all of this discussion about what other possible reason could he have other than killing the guy? Because the jury can just take a statement. Well, two points then, Judge Fischer. The first is, and I will be mindful of my time. The first is that if it became the no-brainer that is asserted in light of the statements, we wouldn't have substantial jury deliberations, which we had in this case with the statement. So the jury obviously was pondering the case in its totality. But secondly, and ultimately, before I, as a conclusion. I'm sorry. It seems to cut the other way, counsel. Well, it seems to me there is nothing to ponder for hours if, in fact, one has admitted all aspects of the case such that there is no dispute as to his intent. It's so clear that no reasonable juror could find any doubt regardless of the thing. Because of the physical circumstances of the crime. But leaving that aside, since if, in fact, the erroneous admission, if it indeed were erroneous, of a statement were the, whereas the petitioner implied that it always is, these errors would be reversible per se. But we know from the Supreme Court in Brecht that we don't make the metaphysical leaps that we're asked to make in this case. I'm not trying to make a metaphysical leap. My metaphysical problem is how does one top take, try to apply Brecht compared to Chapman in a realistic sense and try, especially when you have this one piece of evidence, which clearly everybody has to agree is powerful. It is a confession. Yes, it's limited to intent, but that was the operative issue. So in a good faith effort on anybody's part, trying to figure out what the impact is, it gets very, very difficult, I submit. I see that my time is up. So what I would simply say in conclusion is that Brecht asks whether, absent the alleged error, a different result is reasonably probable. Not whether it is theoretically possible. Not whether one could conjure up a potential scenario in which this, the murder was best described, I think, by the prosecutor when he explained, just in terms of the circumstances of this ordeal, as an attempt to kill someone several times over. And that, I think, to a rational fact finder is exactly what this Petitioner did. Thank you. Ms. Morrison, I think your time is up. We'll equalize it. And the person in the back there. I would say before the cold, but at last it's warm there, so. Thank you. Just a couple of quick points, Your Honor. The first one is on the Batson claim. Opposing counsel suggested that a comparative analysis between Cerda and Carleberg had never been made before the trial court. That's not so. At page 103 of the excerpts of record, defense counsel brings up Carleberg specifically, noting that she is a young juror, not yet struck. It's true she wasn't yet finally seated, but still the comparison is relevant. As to the highly circumstantial evidence, other than the confession, going to the attempt to kill includes the fact that Mr. Sims cut the phone cord in the hotel room. It's unclear why he would have done that if he was meaning to kill the victim in the bathtub. And also that when speaking with those at the Domino's Pizza and saying when is the cooler going to be open and told it was 11 a.m. the next morning, he says, well, by that time, Ruby and I will be in San Francisco. That sounds like. Yes, but what did he think would happen to the two guys he just strung up in almost 32 degree temperature hanging in such a position that any human being is likely to finally give in? I see that my time is up. May I answer the judge's question? You have until 11 o'clock. Terrific. Our point is that an inference could be drawn of a lack of an attempt to kill despite the highly dangerous nature of what he did because he seems to have tried to give some misdirection to the two people he was putting in the cooler. Why would he tell people he expected to be dead by 11 a.m. the next morning that he and his accomplice would be in San Francisco when, in fact, where they went was Las Vegas, except to try and get the police off of their trail. So, again, I think this evidence is highly circumstantial. It's the kind of evidence that could support a finding of intent to kill, to be sure. But when compared to the highly powerful evidence, and especially considering, as Judge Fletcher mentioned, I think that the fact that this jury was out for so long, even with the confession, suggests that in the jury's mind, given the readback regarding the intent testimony from Perkins, that this was a close call for the jury. The important role that the direct testimony regarding intent to kill must have played in this case defeats any suggestion that the erroneous introduction of that evidence could have been harmless. Thank you, Your Honors. Thank you both. Good arguments. Thank you, counsel, for your argument. We appreciate it. And the matter just argued will be submitted.
judges: B. Fletcher, Rymer, Fisher